# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JANICE R. BESLIN** | **CIVIL ACTION** |
| **VERSUS** | **NO: 11-0702-JCZ-SS** |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION** | |

## REPORT AND RECOMMENDATION

The plaintiff, Janice Beslin ("Beslin"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits and a period of disability under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and her claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

## PROCEDURAL HISTORY

On May 29, 2007, Beslin completed applications for disability and SSI benefits reporting that: (1) she became unable to work on June 30, 2005; (2) her leg hurt; (3) she was unable to stand or walk; (4) she had shortness of breath; (5) she was losing sight in one eye; and (6) she had blurred vision in the other eye. R. 111-121 and 136. On June 15, 2007, the Social Security Administration ("SSA") notified Beslin that her claim was denied. R. 81-84.

On October 29, 2008, there was a hearing before an Administrative Law Judge ("ALJ"). R. 23. Exhibits 1A through 6F were admitted. R. 26. These concluded with medical records from Huey P. Long Medical Center for October 3, 2007 to June 20, 2008. R. 370-443. The ALJ granted Beslin's counsel leave to file a post-hearing memorandum. R. 76. On November 3, 2008, counsel

for Beslin submitted a memorandum. No additional medical records accompanied it, and there was no reference to any medical records beyond those admitted at the October 29, 2008 hearing. R. 173-177. On January 12, 2009, there was an unfavorable decision. R. 12-22. The ALJ's decision does not refer to any medical records beyond those admitted at the hearing.

On February 12, 2009, Beslin requested review of the ALJ's decision with notification that she intended to submit additional medical evidence. R. 7. On August 20, 2010, Beslin submitted a brief to the Appeals Council. R. 179. With the brief were additional medical records from West Jefferson Medical Center ("West Jeff") and Medical Center of Louisiana-New Orleans ("MCLNO"). R. R. 455-572. Beslin reported to the Appeals Council that she was awarded disability insurance benefits as of January 12, 2009 on a subsequent application. R. 180 On February 11, 2011, the Appeals Council denied the request for review. R. 1-3. It noted that it had considered the additional evidence from West Jeff and MCLNO. R. 1 and 4.

On April 1, 2011, Beslin filed a complaint against the Commissioner. Rec. doc. 1. On July 14, 2011, the Commissioner filed the administrative record without including all of the additional medical evidence which was presented to the Appeals Council. The record concluded with part of the MCLNO records for March 25, 2009 to August 19, 2009. R. 455-481.

The parties filed cross-motions for summary judgment. Rec. docs. 15 and 16. On March 12, 2012, the Commissioner filed the remaining medical evidence. R. 482-580. The parties were granted leave to file supplemental memoranda. Rec. doc. 19. Beslin filed a supplemental memorandum. Rec. doc. 20. The Commissioner did not file one. Beslin is represented by counsel.

## STATEMENT OF ISSUES ON APPEAL

Issue no. 1:     Did the ALJ err in failing to properly determine all of Beslin's severe impairments?

Issue no. 2:     Did the ALJ err in failing to perform a function-by-function analysis?

Issue no. 3.     Did the ALJ fail to properly consider the combined effects of all of Beslin's impairments when considering her residual functional capacity?

Issue no. 4.     Was the ALJ's residual functional capacity ("RFC") assessment supported by substantial evidence?

Issue no. 5.     Did the ALJ err when he found that Beslin could perform work existing in substantial numbers in the national economy?

### THE COMMISSIONER'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1.     Beslin meets the insured status requirements of the Act through December 31, 2010.

2.     Beslin has not engaged in substantial gainful activity since June 30, 2005, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     Beslin has the following severe impairments: diabetes mellitus and hypertension (20 CFR 404.1521 *et seq*. and 416.921 *et seq*.)

4.     Beslin does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.     Beslin has the residual functional capacity to perform light work as defined in 20 CFR 404. 1567(b) and 416.967(b) except for only occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes or scaffolds.

6.     Beslin is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     Beslin was born in 1959 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     Beslin has a "limited" level of education, as defined by the Regulations, and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Beslin is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering Beslin's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11.     Beslin has not been under a disability, as defined in the Act, from June 30, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 15-21.

## ANALYSIS

a.     **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues de novo or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence

exists to support it.  <u>Villa</u>, 895 F.2d at 1022; <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  <u>Id</u>. §§ 404.1520, 416.920; <u>Perez v. Barnhart</u>, 415 F.3d at 461; <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), <u>cert</u>. <u>den</u>. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  <u>Id</u>. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  <u>Id</u>. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  <u>Id</u>. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  <u>Id</u>. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  <u>Id</u>. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Id. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

"In determining whether substantial evidence of disability exists, this court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective medical evidence of pain and disability; and (4) the claimant's age, education, and work history." Perez v. Barnhart, 415 F.3d at 462. "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

b.  **Testimony at the Hearing.**

Beslin was 49 years old at the time of the hearing. R. 29. Because she had a baby, she completed the ninth grade, but did not finish the tenth grade. R. 29-30. R. 30. She did not have a GED. R. 32. She worked for fifteen years as a Certified Nurse's Assistant on eight hour shifts. R. 30 and 33. Her duties included picking up patients. R. 33. It was necessary for her to be on her feet almost all of the time. R. 33. She did not have trouble with supervisors at work. She worked at one job for ten years. R. 46-47.

Beslin last worked in June 2005. R. 30. She had slipped and fallen at work earlier in 2005. R. 30. She returned to work after the fall. R. 30.

Beslin had a history of asthma.  R. 35.  She used an albuterol inhaler all of her life.  R. 62.

In 2005, Beslin began having a problem with falling and she became short of breath.  R. 62 and 64.  Since 2005, she had been under a doctor's care and on pain medication.  She took over 13 pills a day.  R. 36, 39-40.  She stopped working in 2005 because she was not able to perform the duties of the job.  R. 31.  She could not stand up and experienced shortness of breath.  R. 31.

Beslin moved to Lecompte, Louisiana after Hurricane Katrina.  She lived there at the time of the hearing.  R. 28.  She had a driver's license.  R. 45.  She did not drive because of vision problems.  R. 45-46.  She had been blind in her left eye since she returned to Louisiana after Hurricane Katrina.  R. 45-46.  She had vision problems with her right eye.  R. 46.  Friends took her to church.  R. 46.  She could not stand for more than twenty minutes.  R. 40.  She could not lift a one gallon container of water.  R. 52.  She could not sit for a long time, and when she stood it hurt.  R. 53.

Beslin prepared her meals at a stove and with a microwave.  R. 47-48.  She did some sweeping.  She did not use a vacuum cleaner, because it made her short-winded.  R. 48.  She did her laundry.  R. 48.  She did not take out the garbage, do gardening or go to the grocery store.  R. 48-49.  She watched TV.  R. 49.  Friends came to see her.  R. 50.  She could balance a checkbook and make sure that her bills were paid on time.  R. 51.  She was able to take care of her personal hygiene.  R. 51.  She read the newspaper.  R. 52.

Beslin went to the hospital the first time for shortness of breath.  She came home from work and collapsed.  Her family called 911.  She was in the hospital for seven days.  She was told there was something wrong with her heart.  R. 34.  She was discharged with blood pressure medication, nitroglycerin and cholesterol medication.  She returned to the hospital for a check-up where she had

a breathing attack. She was given an EKG. R. 36. Two days before Hurricane Katrina she experienced a leg problem and went to the hospital. R. 44. The doctor told her that the test showed that she had spots on her brain. R. 43-44. When she was in Texas after the evacuation from Hurricane Katrina, she was taken to the hospital. After her discharge, she walked about half a block and had another attack. An ambulance was required to take her back to the hospital. R. 36. Her doctors prescribed physical therapy in 2006. R. 49. She could not do the exercises because of leg pain. R. 49. She was diagnosed with panic attacks and received medication for the condition. R. 42. She had trouble sleeping. R. 43.

Beslin had peripheral neuropathy. The pain affected the nerves under her skin, hands, legs and feet. R. 37-38 and 41. The condition was becoming worse. R. 41. She was not told that she had neuropathy until June 9, 2008. R. 58-59.

At the hearing she walked with a stick. R. 36. She reported that the week before the hearing she began having pain in her right thigh. She was in severe pain. At an emergency room she received a shot, but it did not help. She was given pain medication, but it made her drowsy. R. 36-37. She fell, so a friend gave her the stick less than a week before the hearing. R. 38-39 and 55. She did not have a real cane, because she did not have insurance. R. 39. She had to hold onto something when she walked because she did not want to fall. R. 40. Before her friends gave her the stick, she never used a cane or other device to walk. R. 55. She always had problems walking. R. 60. She reported that it was caused by diabetes. R. 61.

Based on the ALJ's description of limitations on light work, the vocational expert testified that there were jobs that could be performed in the national economy. R. 65-68.

c.      **Medical Evidence**.

**2005**

On February 4, 2005, Beslin went to the emergency room ("ER") at West Jeff after a slip and fall at work at the hospital.  She reported pain in her right shoulder, knee and foot.  R. 224.  She was excused from work.  Her condition was good at discharge.  219-20.  X-rays of the right ankle and foot did not reveal any fractures or dislocations.  R. 227-30.  X-rays for the right shoulder were normal.  R. 231-32.

On March 9, 2005, Beslin was hospitalized at West Jeff for two nights.  She came to the ER with complaints of chest pain, shortness of breath and mild nausea.  A stress test was negative.  Medication was prescribed.  R. 190.  The findings were: (1) chest pain of uncertain etiology; (2) cardiac prognosis was good; (3) hypertension without congestive heart failure; (4) mild hypercholesterolemia; (5) non-insulin dependent diabetes; (6) abnormal EKG; and (7) weakness with risk factors for atherosclerotic cardiovascular disease.  R. 193.  During the hospital stay she had an abdominal ultrasound, chest x-ray, myocardial perfusion imaging study.  R. 204-07.  On June 8, 2005, lab work was performed at West Jeff.  R.  186-188.

On September 3, 2005, Beslin was seen at the ER for Ben Taub hospital in Houston ("Ben Taub").  She requested refills of her medication.  She had no other complaints.  Her prescriptions were refilled.  R. 286-288.  On October 14, she returned to Ben Taub with complaints of pain in her left leg.  R. 267.  She reported leg pain and swelling.  A radiology report did not find evidence of deep venous thrombosis.  R. 260.

On November 2, 2005, Beslin was seen at the Metroplex Hospital in Killeen, Texas ("Metroplex Hospital") for complaints of headaches, altered mental status, confusion and vertigo.

A CT scan of the head was normal with no central nervous symptoms.  R. 257.  A radiology report indicated the heart size was normal.  R. 258.

## 2006

On February 24, 2006, Beslin returned to the ER at the Metroplex Hospital with a report of chest pain.  R. 240-41.  A chest x-ray revealed no acute disease.  R. 236.

On July 9, 2006, Beslin was seen at Ben Taub with complaints of palpitations, diabetes and hypertension.  R. 275.  She also complained of shortness of breath.  R. 275-279.  When she was discharged, she walked to the bus stop.  She experienced breathing problems and returned to the hospital with anxiety symptoms.  R. 280-282.  On July 12, she was seen at Ben Taub for an appointment.  She was to return on August 23.  R. 273.

On October 10, 2006, Beslin was seen at the Huey P. Long Medical Center in Pineville, Louisiana ("HPL") for refills of her medication.  R. 294.  On November 2, a lumbar spine x-ray did not reveal any evidence of fractures or dislocations.  The disc spaces were well maintained.  R. 297.

## 2007

A January 7, 2007, chest x-ray was normal.  R. 296.  On March 27, there was an eye exam. R. 301.  On June 14, she was seen at HPL for complaints of pain in both legs.  She reported a problem in her left eye which was to be followed by ophthalmology.  Medication was prescribed for hypertension.  Her asthma was described as stable.  R. 366.  On July 24, she contacted HPL concerning her medications.  R. 362.

On August 8, 2007, Beslin went to the ER at HPL.  R. 332.  She reported: (1) pain in her left foot and hand; (2) a problem with balancing since waking in the morning; (3) right eye irritation; and (4) mental status challenges (could not remember her Social Security number or how to spell

her name). R. 332. She was admitted for two nights for a diagnosis of cerebrovascular accident. R. 308. She complained of pain in her left lower leg pain and foot. R. 309. She was diagnosed with diabetes, hypertension, bronchial asthma and plantar fasciitis. R. 308-310. On August 9, she complained of leg and foot cramps. R. 320. A brain CT scan was negative. R. 315. A carotid sonogram demonstrated no significant symptoms. R. 313. An echocardiogram revealed mild to moderate regurgitation of the pulmonic valve and no valvular abnormalities. The endocardial surfaces were clean. R. 358. On August 10, she was discharged to return home. R. 321. Medications were prescribed. She was not restricted except to the extent she could tolerate activity. She was to return in three weeks to the office. R. 360.

On August 31, 2007, she was admitted to HPL for plantar fasciitis. She was diagnosed with neuropathy in the left leg. R. 307. On September 10, she complained of left leg pain. R. 304. She refused to complete an MRI of the lumbar spine because she was claustrophobic. R. 303. On September 20, she was seen at HPL for a complaint of chronic left leg pain. R. 301. The MRI of the lumbar spine was rescheduled for October 3 and was normal. R. 450-451.

An October 17, 2007 mammogram did not reveal any evidence of cancer. R. 448-449. On November 25, she went to the ER at HPL and complained of shortness of breath. R. 432 and 435. A chest x-ray did not reveal any signs of active cardiac, pulmonary or osseous abnormalities. R. 443. On November 25, she was discharged to her home in good condition. R. 437. She ambulated without difficulty. R. 434.

**2008**

On March 9, 2008, she went to the ER at HPL and reported pain in her left shoulder and arm. R. 425. An x-ray of the left shoulder was normal. R. 428. She was discharged in good condition.

R. 426.  She ambulated without difficulty.  She was not in acute distress.  R. 424.  On March 12, she returned to the ER at HPL and reported a cough, shortness of breath and wheezing.  R. 415.  When she was discharged, she did not voice any complaints.  R. 414.

On April 2, 2008, she went to the ER at HPL and reported acute pain episodes in her left flank, foot and arm.  R. 399.  A CT scan did not identify any obvious distal ureteral calculi and the abdomen was normal.  R. 406.  Her condition was stable when she was discharged.  R. 401.  She returned to the ER on April 3 and reported low back pain.  She was discharged with no complaints.  She ambulated without difficulty.  R. 398.

On June 4, 2008, she went to HPL's outpatient clinic and reported that her right eye was watering, burning and painful.  R. 390.  On June 9, she returned to the clinic with reports of left foot and leg problems.  R. 387.  A June 11, CT scan of the brain did not reveal any abnormalities.  R. 386.  On June 13, she went to the ER at HPL and reported headaches, back pain and neck pain.  R. 378 and 381.  She was discharged in improved, good and stable condition.  R. 380 and 382.

On June 20, 2008, she reported left foot pain.  R. 372.  A June 20 echocardiogram was of poor technical quality.  A sinus rhythm was present.  R. 373.  She was scheduled for an appointment in three months at the medicine clinic for HPL.  R. 371.

On December 25, 2008, Beslin went to the ER at West Jeff.  R. 544-46.  She reported that one week earlier she was admitted to Meadowcrest Hospital for a rapid heart beat.[2]  At the West Jeff ER she reported: (1) pain in her left arm; and (2) weakness in her left arm and leg for the previous two to three days.  She was not in acute distress.  R. 549.  There was pain with palpation of the area of the left trapezius, the muscles connecting the left upper arm to the vertebral column.  The

---

[2]  There are no records of the treatment at Meadowcrest Hospital.

neurologic examination revealed an appearance of weakness for the upper left arm and left lower leg. The right side was normal. R. 550. The motor strength on the right was 5/5 and equal. On the left lower extremity it was 4/5. The left upper extremity was limited mostly by pain but about 3/5 motor strength. Reflexes were 2+ and equal. The cranial nerves were intact. R. 555. The diagnoses included cervical radiculopathy, neck pain radiating to the left arm and hand with associated weakness and chronic peripheral neuropathy. R. 556.

Beslin was admitted to the hospital. She reported that on December 23, 2008, she became dizzy when she stooped to remove clothes from the washing machine. On December 24, she woke up with pain in the back of her head and the left side of her neck radiating to her left upper arm and into her left hand. On December 25, it became worse and her left hand became swollen and numb. There was a pulling sensation in the left arm and leg. R. 252. She noticed some shortness of breath over the preceding 24 hours with household chores like ironing clothes. R. 553.

After being in the hospital, the pain subsided. Certain changes in the position of the arm brought on the pain in the neck area. R. 559. She could not raise her left arm. R. 560. There was no objective evidence of weakness, but there was concern that there might be a problem in the neck area. An MRI of the neck with and without contrast was required. R. 560. Visual acuity on the left side was nil. R. 560.

A cervical MRI revealed a mild broad-based disc bulge at C6-7 without significant encroachment. R. 578. A CT head scan suggested chronic ischemic change. There were no acute findings. R. 575. An MRI of the brain revealed small vessel ischemic disease. A follow-up study with contrast was recommended. There were no acute, cortical or territorial infarcts. R. 577. A scan of the carotid arteries did not reveal high-grade stenosis. Mild plaque was present. R. 576.

There was no hemodynamically significant lesion in either carotid system.  R. 579.  A chest x-ray did not reveal any acute pulmonary disease.  R. 574.  There was no evidence of left lower extremity deep venous thrombosis.  R. 580.

On December 29, 2008, she was discharged.  It was felt that many of her symptoms would not be explained by exams or tests.  She was stable for discharge for management as an outpatient.  R. 562.  She was to follow up with a doctor in two to three weeks.  She was referred to follow-up at the Jefferson Community Health Care.  R. 563.

## 2009

On March 11, 2009, Beslin went to the ER at West Jeff.  R. 532.  She complained of a funny feeling like before.  R. 565.  She reported headaches all day long.  They went down the back of her head into her arms.  She was unable to lie down.  R. 534.  On March 12, 2009, there was a brain scan.  R. 565.  There was no acute change since December 25, 2008.  R. 566.

On March 25, 2009, Beslin went to the clinic at the MCLNO to establish care.  R. 506.  There was a history of chronic decreased vision in the left eye.  R. 507.  Her hypertension was described as under control.  She was referred to neurology, health maintenance, ophthalmology and podiatry.  R. 508.

On April 28, she went to the clinic at MCLNO for a follow-up appointment on diabetes management.  R. 503-05.  On May 15, she went to the ER at MCLNO with reports of left side pain in her left shoulder and left forearm.  R. 501-02.

On May 21, she returned to the clinic at MCLNO with complaints of radiculopathy with pains that tended to go to her arm when her head was turned in certain ways.  R. 497-500.  The examination revealed some mild back discomfort.  Straight leg raising procedures produced some

discomfort in her left leg and no right leg pain.  There was no swelling of the extremities.  R. 498.  The prior laboratory studies were described as essentially normal for the left shoulder and left knee.  The lumbar spine study showed some slight lumbar scoliosis.  The cervical spine study did not show any acute bony abnormalities.  R. 499.

On June 18, 2009, Beslin reported thoughts of suicide to a mental health center.  R. 488.  She was admitted to MCLNO for eleven days (June 19 to June 30).  There was a growing focus on multiple medical problems and frustration with a complicated pill regimen and acute pain.  R. 483.  The pill regimen was simplified.  She had a fall in the hospital. R. 484.  When she was discharged, her mood was improved.  She was stable.  She denied suicidal and homicidal ideation.  R. 485.

On July 4, 2009, Beslin was admitted to MCLNO with complaints of pain in her chest.  R. 475-81.  A July 6 echocardiogram was normal.  R. 473-74.  On July 7, she was discharged from MCLNO.  R. 510-15.  On July 21, she was seen at MCLNO for a headache and inability to turn her head.  R. 470-71.  A July 22 electrocardiogram was abnormal.  R. 469.  It was negative for ischemia.  R. 458.  On July 27, she returned for complaints of leg pain.  R. 467.

On August 19, she went to the clinic for a follow-up visit.  R. 457.  She was without chest pain, edema or swelling of the leg, double or blurred vision, colds, cough or wheezing.  Her history of asthma was stable.  She did have some numbness of the feet at times.  Her diabetes was not under adequate control.  R. 458.  Changes in her diet and exercise were recommended.  R. 459.  She was required to take twelve medications at least once day.  A thirteenth medication was to be taken as needed.  Nitroglycerin was prescribed, but had not been recently used.  R. 457.  Her lab results were consistent with anemia.  R. 458.  The neuropathy was described as decreased sensation in the feet.  She was to follow-up with neurology.  R. 459.

d.     **Plaintiff's Appeal**.

<u>Issue no. 1</u>.     Did the ALJ err in failing to properly determine all of Beslin's severe impairments?

Beslin has the burden of proof under the first four parts of the five step evaluation inquiry. <u>Leggett v. Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995). At the second step the issue is whether Beslin has a severe mental or physical impairment which would limit her ability to perform basic work-related functions. 20 C.F.R. §§ 404.1520(c), 416.920(c).

The ALJ found that Beslin had two severe impairments: (1) diabetes mellitus; and (2) hypertension. R. 14. The ALJ noted that Beslin alleged that she suffered from anxiety, asthma, plantar fasciitis, cerebrovascular accident and left eye blindness. R. 15. Beslin contends that the ALJ erred: (1) in not finding that her eyesight was a severe impairment; and (2) in misidentifying her leg pain/diabetic neuropathy as plantar fasciitis and in not finding the impairment severe.

A.     <u>Eyesight</u>.

The ALJ commented that: (1) there was no evidence of visual acuity testing; and (2) on March 12, 2008, it was reported that she had no significant abnormalities of her eyes (R. 415). Beslin cites three medical records for her contention that she suffered from a severe eye impairment. On June 14, 2007, the physical exam noted decreased vision in her left eye, which was being followed by ophthalmology. R. 366. On April 8, 2008, she was seen at the HPL eye clinic. This was a return visit for a yearly examination. She reported a hole in the bottom of her left eye. The note refers to "LP" for the left eye. Beslin reports that this stands for light perception and the left eye can only perceive light. Rec. doc. 15 (Memorandum at 4). The diagnoses were: (1) amblyopia (lazy eye - a vision deficiency in the eye which is otherwise normal); (2) RPE (retinal pigment epithelial) atrophy; and (3) monocular precautions. She was to return in one year. R. 392. On June

4, 2008, she was seen at the HPL outpatient clinic. She reported that her right eye was running and painful. The diagnosis included monocular precautions. R. 390. Later records reported decreased vision in her left eye. See the March 25, 2009 note from MCLNO. R. 506-07.

In Story v. Astrue, 294 Fed.Appx. 883, 884, (5th Cir. 2008), the claimant contended that the record lacked substantial evidence to support the ALJ's finding that his blindness was not a "severe impairment." The Fifth Circuit stated:

> A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. 404.1520(c). "An impairment can be considered not severe only if it is a slight abnormality [having] such minimal effects on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir.1985).

Id. While it was clear that the claimant in Story v. Astrue was blind in his right eye and suffered some level of resulting pain and discomfort, the record revealed that he worked on construction jobs and performed daily activities such as gardening, mowing the lawn, and walking to visit his relatives. The Fifth Circuit held that this constituted substantial evidence to support a finding that his impairment did not "substantially limit" his ability to do "basic work activities."

Beslin reports that she lost sight in her left eye due to a childhood injury and worked for fifteen years with that condition. Rec. doc. 15 (Memorandum at 5). The review of symptoms on October 15, 2005 noted no trouble with vision. R. 267. There was no notation of a problem with her eyes for a July 9, 2006 review of symptoms. R. 277. On August 8, 2007, a review of symptoms recorded no significant abnormality for her eyes. R. 328 and 335. On March 12, 2008, it was reported that she had no significant abnormalities for her eyes. R. 415. The results of a June 13, 2008 physical examination for the eyes were "[n]o significant abnormality of the eyes; no eye trauma; pupils are equal and react to light (PERL); eyes exhibit full range of motion (FROM)." R.

381.  There is substantial evidence to support a finding that Beslin's vision impairment did not "substantially limit" her ability to do "basic work activities."

     B.      <u>Leg pain/diabetic neuropathy</u>.

The ALJ did not discuss leg pain or diabetic neuropathy.  At the second step, the ALJ referred to plantar fasciitis and found that Beslin sought treatment for the condition on only one occasion.  R. 16.  Beslin contends that: (1) she complained about leg pain on numerous occasions;[3] (2) she was diagnosed with diabetic neuropathy on August 31, 2007;[4] (3) neurontin was prescribed; (4) the ALJ misapprehended the diagnosis and did not make a complete review of the record; and (5) leg pain/diabetic neuropathy was a severe impairment.  Rec. doc. 15 (Memorandum at 6-7).

On August 8, 2007, Beslin was admitted to HPL for two nights.  The admitting diagnoses were left lower leg pain, type II diabetes, hypertension and bronchial asthma.  The discharge diagnoses were type II diabetes, hypertension, bronchial asthma, and plantar fasciitis.  The physical examination reported some pain in her left foot and ankle area.  There was no weakness in the leg. R. 308-309.  She was given Motrin in the hospital which helped with her foot pain.  She would not let a physical therapist touch the foot because of pain.  Her condition was stable at discharge.  R. 309.  She was to return in three weeks.  R. 310.  On August 31, Beslin returned to HPL's outpatient clinic for a follow-up on the plantar fasciitis.  The nurse's note indicates that there was no improvement since her discharge on August 10.  The summary of the clinic visit reported that she had an unsteady gait on the left leg.  The diagnosis was neuropathy-left leg with a reference to

---

    [3]  She cites:  March 11, 2005 (R. 191); October 15, 2005 (R. 264); February 1, 2007 (R. 293); June 14, 2007 (R.366); August 8, 2007 (R. 309-10, 332); September 2007 (R. 301); March 9, 2008 (R. 422); June 2008 (R.372); June 13, 2008 (R. 382); and July 27, 2009 (R. 467).

    [4]  On August 31, 2007, Beslin went to the HPL outpatient clinic to follow-up for plantar fasciitis.  The diagnosis was neuropathy in the left leg.  There is an indication that she was referred to neurology.  R. 307.

neurology. R. 307. There is no evidence that she was seen by a neurologist for the pain in her left leg. Ten days later, on September 10, she returned to HPL for an MRI of the lumbar sacral spine. The diagnosis was left leg pain. R. 304. She refused the MRI because she was claustrophobic. R. 303. On September 20, she returned to HPL with complaints of chronic left leg pain. She reported that she had walked with a limp for two years and the pain was getting worse. It was noted that she had not received a neurology appointment. The MRI was rescheduled. There is no mention of a diagnosis of neuropathy. R. 301. The MRI of the lumbar spine was normal. R. 450. On November 25, she went to the ER at HPL and complained of shortness of breath. There is no report of pain in her leg or foot. R. 432. The past medical history records diabetes mellitus which the ALJ found was a severe impairment. It did not include neuropathy. R. 433. When she was discharged on November 25, 2007, she ambulated without difficulty. R. 434. She did not return for medical treatment until more than three months later on March 9, 2008, when she reported pain in her left shoulder. When she was discharged by the ER, it was noted that she ambulated without difficulty. R. 424. The one-time notation of neuropathy on August 31, 2007 does not demonstrate a severe impairment of diabetic neuropathy of the left leg.

The records for Beslin's December 25-28, 2008 hospitalization at West Jeff were not before the ALJ, but they were before the Appeals Council. At West Jeff she was diagnosed with cervical radiculopathy, neck pain radiating to the left arm and hand with associated weakness and chronic peripheral neuropathy. R. 556. On December 29, 2008, she was discharged. It was felt that many of her symptoms would not be explained by exams or tests. She was stable for discharge for management as an outpatient. R. 562. She was to follow up with a doctor in two to three weeks. She was referred to follow-up at the Jefferson Community Health Care. R. 563.

Beslin contends that the ALJ did not consider all the record evidence in failing to find that leg pain/diabetic neuropathy was a severe impairment. Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."). The Commissioner responds that the ALJ is not required to specifically explain each piece of evidence that he accepted or rejected. In Falco v. Shalala, 27 F.3d 160, 163 (5th Cir. 1994), the Fifth Circuit rejected the requirement that the ALJ must articulate specifically the evidence that supported his decision and discuss the evidence that was rejected. In Falco, the ALJ was required to articulate the reasons for rejecting the claimant's subjective complaints of pain when the evidence clearly favored the claimant.

The ALJ considered Beslin's claim that she was diagnosed with peripheral neuropathy of her upper and lower legs. R. 19. He noted the reports and diagnoses of left leg pain and left lower leg pain. R. 18. There was substantial evidence to support the ALJ's determination that Beslin did not establish a severe impairment, including diabetic neuropathy, with regard to her left leg. The records of Beslin's December 2008 hospitalization do not compel a different conclusion.

Issue no. 2.    Did the ALJ err in failing to perform a function-by-function analysis?

Social Security Ruling 96-8p provides:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8P, 1996 WL 374184, *1 (S.S.A.).[5] Beslin contends that the ALJ failed: (1) to conduct a

---

[5] 20 C.F.R. § 404.1545 relates to the residual functional capacity assessment. Subparts (b)-(c) are concerned with physical abilities, mental abilities, and other abilities affected by impairments. For example, "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions . . .) may reduce your ability to do past work

function-by-function analysis of her ability to perform the exertional requirements of light work; (2) to consider whether she had the ability to stand and/or walk for six hours in an 8-hour day; and (3) to consider the effect of her neuropathic leg pain on her ability to do stand and/or walk.

The ALJ found that Beslin had the RFC to perform light work except for only occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes or scaffolds. R. 17. The Commissioner responds that: (1) there is substantial evidence, including Beslin's own statements, to support this finding; (2) the evidence does not support modification of the RFC on account of the alleged severe impairments with the left eye and diabetic neuropathy of the left leg; (3) SSR 96-8p does not place specific demands on an ALJ during an administrative proceeding; and (4) the ALJ complied with SSR 96-8p.

SSR 96-8p provides that:

> [I]n order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.

1996 WL 374184, *3. As part of the determination that Beslin's alleged mental impairment of anxiety was not severe, the ALJ found that it "causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area. . . ." R. 15. He found that Beslin's alleged impairments caused no more "than minimal limitations" in her ability to perform basic mental work activities. R. 16. Following the finding of her RFC, the ALJ reviewed the medical evidence pertaining to her physical condition.

and other work." 20 C.F.R. § 404.1545(b).

R. 18.  The ALJ described her testimony at the hearing, including her description of her daily activities, and his observations on her use of a walking stick at the hearing.  R. 19.  He determined that while medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning them were not credible and the objective medical evidence did not support her subjective complaints of disabling impairments.  R. 19.  The ALJ considered her ability to walk, stand, sit and lift in the context of her description of her impairments.  R. 19.  The ALJ complied with SSR 96-8p.  None of the additional medical records submitted by Beslin report any use of a device like a cane to assist her with walking.

On June 18, 2009, Beslin reported thoughts of suicide to a mental health center.  R. 488.  She was admitted to MCLNO on June 19 and discharged on June 30.  There was a growing focus on multiple medical problems and frustration with a complicated pill regimen and acute pain.  R. 483.  She was described as a danger to herself.  R. 494.  The pill regimen was simplified.  She had a fall in the hospital. R. 484.  When she was discharged, her mood was improved.  She was stable.  She denied suicidal and homicidal ideation.  R. 485.

The ALJ found that Beslin was not under a disability, as defined in the Act, from June 30, 2005 through January 12, 2009.  R. 21.  In Castillo v. Barnhard, 325 F.3d 550 (5th Cir. 2003), the Fifth Circuit stated that "[n]ew evidence may be grounds for remand if it is material; this materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied. . . ."  Id. at 551-552.  The evidence of the eleven day hospitalization in June 2009 does not meet the materiality requirement as it does not relate to the time period for which disability benefits were denied.

<u>Issue no. 3.</u>    Did the ALJ fail to properly consider the combined effects of all of Beslin's impairments when considering her residual functional capacity?

Beslin contends that the ALJ failed to consider all of her severe impairments because he did not consider her neuropathic leg pain and left eye blindness. She urges that even if these are not considered severe impairments, they must be considered. The regulations provide:

> In determining whether your . . . impairments are of sufficient medical severity that such . . . impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523. The ALJ acknowledged that he was required to consider all of Beslin's impairments, including those that were not severe. R. 14. He found that she did not have a combination of impairments that met or medically equaled one of the listed impairments. R. 16-17. The ALJ's consideration of the medical evidence demonstrates that he considered her complaints of left leg pain and left eye blindness. R. 18. The ALJ described her testimony concerning her complaints of left leg pain, the report that she was diagnosed with peripheral neuropathy of her upper and lower legs, and evidence related to her sight and leg pain. For example, he noted that: (1) she watched television; (2) she was able to read the newspaper; (3) her walking stick was not prescribed; and (4) she was not given the walking stick until the week before the hearing. R. 19. There is no merit to Beslin's contention that the ALJ failed to consider the combined effect of all of her impairments without regard to whether any such impairment, if considered separately, was a severe impairment.

<u>Issue no. 4.</u>    Was the ALJ's RFC assessment supported by substantial evidence?

The fourth issue raised by Beslin is whether the ALJ's RFC assessment is supported by substantial evidence. Rec. doc. 15 (Memorandum at 3). Beslin contends that this follows from her

23

statement of the first three errors. The ALJ, however, did not err on the first three issues. It does not follow that the ALJ's RFC assessment was not supported by substantial evidence.

The ALJ found that:

(Beslin) has the residual functional capacity to perform light work as defined in 20 CFR 404. 1567(b) and 416.967(b) except for only occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, and no climbing of ladders, ropes or scaffolds.

R. 17. The ALJ relied upon medical evidence and testimony from the hearing. R. 18-19. He concluded that the objective medical evidence supported this assessment. R. 20. Substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 135. There is substantial evidence to support the ALJ's assessment.

Issue no. 5.     Did the ALJ err when he found that Beslin could perform work existing in substantial numbers in the national economy?

Beslin argues that the ALJ's findings at Step 5 are not supported by substantial evidence. Rec. doc. 15 (Memorandum at 3). She based this assertion on the prior statements of error. For example, the allegedly flawed RFC led to flawed questions to the vocational expert. Id. at 9. The ALJ did not err at issue nos 1-4, so Beslin's argument at issue no. 5 is without merit. As the Commissioner notes, the ALJ found that Beslin retained the RFC to perform a reduced range of light work. R. 17. Based on the ALJ's hypothetical question, the expert testified that there were a significant number of jobs in the national economy which could be performed. R. 66.

**RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment (Rec. doc. 16) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 15) be

DENIED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 14th day of May, 2012.

**SALLY SHUSHAN**
**United States Magistrate Judge**